Filed 9/3/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| HELEN J. BOUNDS et al., | B254505 |
| Petitioners, | (Los Angeles County Super. Ct. No. YC068863) |
| v. | |
| THE SUPERIOR COURT OF LOS ANGELES COUNTY, | |
| Respondent; | |
| KMA GROUP et al., | |
| Real Parties in Interest. | |

ORIGINAL PROCEEDINGS in mandate, prohibition and/or other appropriate relief.  Stuart M. Rice, Judge.  Petition granted.

Ethan Brown Law, Ethan J. Brown and Sara C. Colon for Petitioners.

No appearance for Respondent.

Michael Leight for Real Parties in Interest.

# INTRODUCTION

In this proceeding, Helen J. Bounds (Bounds) and the Helen J. Bounds Living Trust (the Trust) petition for a writ of mandate compelling the trial court to vacate its order sustaining without leave to amend a demurrer to their two causes of action for financial elder abuse alleged under the Elder Abuse and Dependent Adult Civil Protection Act (Welf. & Inst. Code, §§ 15600, et seq. (the Act).[1]

Bounds, an 88-year-old widow allegedly suffering from Alzheimer's disease, alleges in her cross-complaint that for approximately six months, Real Parties in Interest Gerry Mayer (Mayer), Joseph Sojka (Sojka), and their associated businesses entities (KMA Group, LLC, Kopykake Enterprises, and Sojka-Nikkel Commercial Realty Group) engaged in abusive conduct, resulting in her signing, among other documents, escrow instructions authorizing the sale of real property owned by the Trust. Because escrow was cancelled, the Trust retains title to, and Bounds remains in possession of, the property. However, petitioners allege that the existence of the escrow instructions significantly impairs their right to sell the property at fair market value or to use it to secure a loan on favorable terms.

These alleged facts raise an issue of first impression: whether to allege a "taking" of a property right under the Act, it is sufficient to plead that an elder has entered into an unconsummated agreement which, in effect, significantly impairs the value of the elder's property, or whether the Act requires that the agreement have been performed and title have been conveyed. In relevant part, the Act provides that "financial abuse" of an elder occurs when "a person or entity . . . *[t]akes* [or] assists in taking . . . real or personal property of an elder . . . for a wrongful use or with intent to defraud, or both" (§ 15610.30, subds. (a)(1) & (2), italics added) or "by undue influence." (§ 15610.30, subd. (a)(3).) It provides that

---

[1]    All undesignated statutory references are to the Welfare and Institutions Code.

someone "takes" such property when the elder "*is deprived of any property right, including by means of an agreement*, donative transfer, or testamentary bequest. . . ." (§ 15610.30, subd. (c), italics added.)

As explained more fully below, we conclude that because property rights include, among other things, the right to use and sell property (*Estate of Sigourney* (2001) 93 Cal.App.4th 593, 604), petitioners' allegations that Bounds entered into an executory agreement which significantly impaired the value of the property owned by the Trust adequately pleads a "taking" -- that is, adequately pleads that Bounds has been "deprived of [a] property right . . . by means of an agreement," within the meaning of section 15610.30, subdivision (c). Therefore, we grant the petition and issue the writ compelling the trial court to vacate its order sustaining the demurrer to petitioners' financial elder abuse claims.

**BACKGROUND**

I. *The Cross-Complaint*

Because this proceeding arises from the sustaining of a demurrer, we assume the truth of all facts properly pled in the operative pleading – the Second Amended Cross Complaint (SACC) -- and also accept as true all facts that may be implied or inferred from those expressly alleged. (*Curcini v. County of Alameda* (2008) 164 Cal.App.4th 629, 633, fn. 3, and cases cited therein.) In addition, we consider all evidentiary facts found in the exhibits attached to the SACC (*Satten v. Webb* (2002) 99 Cal.App.4th 365, 375) as well as all judicially noticed matters (*Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081). Below, we summarize the allegations of the cross-complaint.

Bounds is an 88-year-old widow. At all relevant times she was the trustee of the Trust, and suffered from, but had not yet been diagnosed with, Alzheimer's disease. The Trust owns real property located at 3737 West 240th Street in

3

Torrance, California (the real property). Wm. Bounds, Ltd. (Bounds, Ltd.), a family business founded over 40 years ago by Bounds' late husband, operates its business on the real property. The business manufactures and sells, among other things, salt and pepper shakers. The Trust is a majority shareholder of Bounds, Ltd.

Bounds, Ltd. shares a driveway and parking lot with Kopykake Enterprises (Kopykake). Mayer is a principal of Kopykake and has operated the business for decades. In addition, Mayer is a principal of KMA Group, LLC (KMA). Bounds knows and trusts Mayer.

By mid-2012, Bounds, Ltd. was in dire need of funds to maintain the business. Bounds, without any knowledge of her family and in a deteriorating mental condition, began negotiating with Mayer to sell the real property to KMA and Kopykake. Joseph Sojka (Sojka), President of Sojka-Nikkel Commercial Realty Group (Sojka-Nikkel) also was involved in the negotiations, attempting to persuade Bounds to sell the property to Kopykake and KMA. (Sojka had a prior relationship with Mayer, Kopykake, and KMA.) Mayer and Sojka made exaggerated claims about the poor physical and financial condition of the real property to frighten Bounds into selling it at a bargain price. Sojka repeatedly tried to telephone Bounds to convince her to sell. Bounds did not understand the status or terms of the negotiations and Mayer and Sojka knew or should have known about Bounds' cognitive failings.

In the fall of 2012, Bounds consulted with an attorney and accountant to draft a counter-offer to sell the real property for $3.45 million. At about the same time, Bounds' family members first learned about the negotiations. Ultimately, Bounds' family and professional advisors explained to her that even a $3.45 million sale would not raise sufficient funds to maintain Bounds, Ltd. and that, in fact, the sale would result in a severe tax liability for Bounds and would leave

4

Bounds, Ltd. without a location to operate. As a result, Bounds decided not to sell the real property.

Bill Bounds, a member of Bounds' family, told Mayer about Bounds' decision. Bill Bounds also informed Mayer and Sojka that Bounds was acting with diminished capacity. Mayer's response was to claim that Bounds had agreed to sell.

In late 2012, Bounds' mental condition, memory and hearing deteriorated further. In December 2012, while Bounds' family was away on vacation, Mayer saw Bounds at the real property and asked her if she had changed her mind. This led to further discussions between Bounds, Mayer and Sojka. At this point, Bounds felt overwhelmed by mounting debt, suffered from pain in her head, and had difficulty sleeping. Mayer took advantage of Bounds' distress to convince her to sell the real property.

On January 8, 2013, Mayer persuaded Bounds to execute a 4-page Letter of Intent (LOI) to sell the real property to KMA for $2 million and some of Bounds, Ltd.'s manufacturing equipment to Kopykake for $500,000. The LOI further recited that KMA would lease-back the real property for a 2-year period on specified terms. The LOI stated that if Bounds signed and delivered an acceptance by January 15, escrow would open with formal instructions based upon the LOI's terms and conditions; otherwise, the LOI would expire.

Sojka negotiated the LOI on behalf of Mayer, Kopykake, and KMA even though the LOI stated that no real estate agent represented any party. Sojka knew the sales price was substantially under market and that Bounds was acting without any professional assistance but with impaired mental capacity.

On January 10, 2013, Mayer and Sojka had Bounds execute two sets of escrow instructions even though no contract had been signed. The first set of instructions directed the sale of the real property to KMA for $1,785,800—an

amount that the SACC alleges is "a remarkable bargain price"—and the second set directed the sale of the manufacturing equipment to Kopykake for $500,000. Bounds was unable to read or understand the LOI or the escrow instructions or to comprehend the economics or tax consequences of the transactions. In addition, Bounds executed (but does not recall executing) a lease agreement on behalf of Bounds, Ltd. with KMA, which, on information and belief, reflected a higher implied value of the property than the purchase price reflected in the escrow instructions.

Bounds trusted Mayer and Sojka to be fair and, as a result, mistakenly believed the transactions would resolve her financial problems. Mayer, Kopykake and KMA presented Bounds with escrow instructions instead of formal purchase and sale contracts to induce her to sign without consulting her attorney, accountant or family. Mayer knew, based upon his earlier negotiations, that any third party involvement would make it difficult, if not impossible, to consummate the purchase.

Bounds did not inform her relatives about the documents she had signed. Instead, a month later she consulted her attorney, mistakenly believing that more negotiations could be conducted. Counsel sought to negotiate fair terms with the buyers on the ground that no purchase and sale contracts had been signed. Kopykake and KMA refused. Accordingly, Bounds, through counsel, terminated escrow. Counsel informed Mayer to communicate with him, not Bounds. Mayer ignored this request and sought out Bounds to demand that she consummate the sale or face a lawsuit.

Meanwhile, Bounds' family learned that just weeks after Bounds had signed the LOI and the escrow instructions, Bounds had been diagnosed with Alzheimer's disease, vascular disease and atrophy of the brain resulting in substantial short-term and working memory impairment. Bounds' counsel informed counsel for

6

Kopykake and KMA of this development as well as the result of his investigation of the real property's true value and sought to resolve the matter. Kopykake and KMA refused, demanding that the transactions be closed based upon the escrow instructions.

## II. *The Lawsuit, Cross-Complaint and Demurrer*

On March 20, 2013, KMA and Kopykake filed suit against the Trust. Relying upon the escrow instructions, KMA and Kopykake sought specific performance of the contracts to sell the real property and the manufacturing equipment. KMA and Kopykake recorded a lis pendens on the real property.

The Trust and Bounds filed a cross-complaint against real parties Mayer, KMA, Kopykake, Sojka and Sojka-Nikkel, alleging causes of action for financial elder abuse, rescission and declaratory relief, and seeking recovery of compensatory and punitive damages and attorney fees. The operative pleading is the SACC. The first claim for financial elder abuse names Kopykake and KMA as cross-defendants, and alleges that they "took" the subject real property. The second names Mayer, Sojka, and Sojka-Nikkel as cross-defendants and alleges that they assisted in the taking of the property. In addition, the two claims allege:

> "Immediately upon the signing of the escrow instructions and lease Bounds' property rights in the Property were taken and substantially impaired. The Trust could not sell the Property without disclosing the escrow instructions, lease, and Mayer's assertion to Bounds and through counsel to Bounds' counsel that KMA had a legally enforceable right to acquire the Property. No buyer would agree to acquire the Property at any amount approximating fair market value given KMA's claims to own the Property. Similarly, prior to the execution of the escrow instructions and lease, Bounds retained the property right to borrow against the Property and grant a lien against the Property in order to secure such borrowing. After the execution of the escrow instructions and lease, no lender would loan money against the Property on reasonable and commercially

7

acceptable terms.  Accordingly, KMA took these and other substantial property rights from Bounds and the Trust by virtue of their wrongful actions."

The trial court sustained without leave to amend real parties' demurrer to the causes of action for financial elder abuse and granted their motion to strike the causes of action for rescission and declaratory relief.  This petition by the Trust and Bounds followed.  It challenges only the sustaining of the demurrer  to the elder abuse claims.  We issued an order to show cause and now grant the petition and issue the writ.

## DISCUSSION

### I. *Procedural Contentions*

At the outset, we dispose of real parties' procedural contentions.  Real parties argue that the writ petition should be denied because it is not properly verified.  We disagree.  The petition was verified by an associate in the law firm representing petitioners.  The verification reads, in pertinent part:  "I make this verification as petitioners' counsel because I am familiar with the facts relevant to this petition.  The facts referred to in this petition are true based on my personal knowledge from my review of the pleadings, briefs, and other documents filed in the superior court."  Rule 8.486(a)(4) of the California Rules of Court requires that "[t]he petition . . . be verified."  But as a leading practice guide explains:  "All facts included in the petition must be verified by the petitioner *or counsel* (as applicable) on personal knowledge, not information and belief.  [Citations.]"  (Eisenberg et al., Cal. Practice Guide:  Civil Appeals and Writs (The Rutter Group 2013) ¶ 15:185, p. 15-93 (rev. #1, 2011), italics added & other italics omitted.)  Here, one of petitioners' attorneys verified the petition based on personal knowledge.  Contrary

8

to real parties' contention, this was sufficient; neither Bounds nor a representative of the Trust was required to verify the petition.

Real parties also argue that petitioners have failed to establish that writ review is appropriate. However, our issuance of the order to show cause determined, in effect, that petitioners' remedy at law was inadequate (*Marron v. Superior Court* (2003) 108 Cal.App.4th 1049, 1056), thus making writ review proper.


II. *Judicial Notice*

Real parties request that this court take judicial notice of: (1) excerpts from Bounds' deposition; (2) Bounds' verifications of responses to real parties' demand for production of documents and to special interrogatories; and (3) excerpts from the deposition of a former employee of Bounds, Ltd., who real parties identify as Bounds' liaison in the negotiations that are the subject of the elder abuse claims.. They rely on the principle that "a complaint's allegations may be disregarded when they conflict with judicially noticed discovery responses." (*Bockrath v. Aldrich Chemical Co.* (1999) 21 Cal.4th 71, 83.)

According to real parties, we should take judicial notice of the excerpts from the depositions of Bounds and the former employee of Bounds, Ltd. (the latter apparently asserted to be Bounds' authorized agent) because they contain testimony concerning the negotiations for the sale of the subject property which "demonstrates that there is no liability under the financial elder abuse statute." As to Bounds' discovery verifications, real parties suggest that judicial notice is appropriate because the verifications are inconsistent with the notion that Bounds suffered any mental impairment. They ask, "How can a mentally incapacitated person verify [the] accuracy and truthfulness of discovery responses?"

The manner in which real parties rely on the discovery materials demonstrates the impropriety of taking judicial notice. It is true that a court may take judicial notice of the pleading party's discovery responses (or those of the party's authorized agent) to the extent "they contain statements of the [party] or his agent which are inconsistent with the allegations of the pleading before the court." (*Del E. Webb Corp. v. Structural Materials Co*. (1981) 123 Cal.App.3d 593, 605.) But in doing so, "[t]he hearing on demurrer may not be turned into a contested evidentiary hearing through the guise of having the court take judicial notice of affidavits, declarations, depositions, and other such material which was filed on behalf of the adverse party and which purports to contradict the allegations and contentions of the plaintiff." (*Ibid*.)

Here, real parties do not seek to have us judicially notice statements of fact that contradict allegations of facts in the SACC. Rather, they seek an impermissible evidentiary hearing to challenge the elder abuse claims on the merits, asking that we draw factual inferences from the discovery materials tending to show that real parties did not engage in elder abuse and that Bounds is not mentally impaired. But that is not a proper use of judicial notice in a demurrer proceeding. (See *Williams v. Southern California Gas Co.* (2009) 176 Cal.App.4th 591, 600 [in a negligence action alleging liability for a leaky gas wall furnace, "the court could take judicial notice of the discovery responses, [but] it was not authorized to draw from those responses the inference that [a defendant] was unaware of defects in the wall furnace, nor was it correct to find, based on this inference, that the operative complaint was not truthful"]; *C.R. v. Tenant Healthcare Corp.* (2009) 169 Cal.App.4th 1094, 1103-1104 ["the contents of a document [that is judicially noticed] may only be accepted ""'where there is not or cannot be a factual dispute concerning that which is sought to be judicially noticed.""' [Citations.]".) We note as well that, in any event, the deposition

10

testimony of Bounds and the former employee of Bounds, Ltd. was given after the trial court sustained the demurrer to the SACC. "Writ review does not provide for consideration of evidence not before respondent court at the time of its ruling. [Citations.]" (*Pomona Valley Hospital Medical Center v. Superior Court* (2013) 213 Cal.App.4th 828, 835, fn. 5.) For the foregoing reasons, we deny real parties' request for judicial notice.

III. *Sufficiency of the Pleading*

A. *Statutory Interpretation*

The Legislature enacted the Act to protect elders by providing enhanced remedies to encourage private, civil enforcement of laws against elder abuse and neglect. (*Intrieri v. Superior Court* (2004) 117 Cal.App.4th 72, 82.) An elder is defined as "any person residing in this state, 65 years of age or older." (§ 15610.27.) The proscribed conduct includes financial abuse. The financial abuse provisions are, in part, premised on the Legislature's belief that in addition to being subject to the general rules of contract, financial agreements entered into by elders should be subject to special scrutiny. (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 140 (2012-2013 Reg. Sess.).)

The Act broadly defines financial abuse as occurring "when a person or entity . . . *[t]akes*, secretes, appropriates, obtains, or retains real or personal property of an elder . . . for a wrongful use or with intent to defraud, or both" (§ 15610.30, subd. (a)(1), italics added) or "by undue influence." (§ 15610.30, subd. (a)(3).) Further, a person or entity that assists in the foregoing conduct is also liable for elder abuse. (§ 15610.30, subd. (a)(2).)

A taking is for a "wrongful use" when a party "knew or should have known that [its] conduct is likely to be harmful to the elder . . . adult." (§ 15610.30, subd. (b).) "Undue influence consists: [¶] 1. In the use, by one in whom a confidence

is reposed by another, or who holds a real or apparent authority over him, of such confidence or authority for the purpose of obtaining an unfair advantage over him; [¶] 2. In taking an unfair advantage of another's weakness of mind; or, [¶] 3. In taking a grossly oppressive and unfair advantage of another's necessities or distress." (Civ. Code, § 1575.)[2]

In the present case, the core dispute is whether Bounds' alleged execution of the escrow instructions is sufficient to plead a taking of the real property[3] within the meaning of section 15610.30, subdivision (a)(3), since title remains in the Trust.[4] Subdivision (c) of section 15610.30 explains: "For purposes of this section, a person or entity *takes*, secretes, appropriates, obtains, or retains real or personal property when an elder . . . *is deprived of any property right, including by*

---

[2] When the SACC was filed, section 15610.30, subdivision (a)(3) referred to the definition of undue influence found in Civil Code section 1575. However, in 2013, the Legislature amended section 15610.30, subdivision (a)(3) to refer, instead, to a broader definition of undue influence found in the newly enacted section 15610.70. This amendment took effect on January 1, 2014, the month after the trial court sustained, without leave to amend, the demurrer to the SAAC. (Stats. 2013, ch. 668, § 2.) The parties assume that Civil Code section 1575's definition of undue influence applies to this proceeding.

[3] In this mandate proceeding, the parties direct their arguments solely to the real property, not the personal property (manufacturing equipment).

[4] Real parties do not contend that the SACC failed to allege undue influence. In regard to a taking for a wrongful use, they rely upon *Stebley v. Litton Loan Servicing, LLP* (2011) 202 Cal.App.4th 522, 527-528 (*Stebley*) to argue that the SACC's allegations are insufficient because they are "doing nothing except asserting their *contractual rights* . . . by filing the complaint and recording the lis pendens." The argument fails. *Stebley* simply found that the act of foreclosure -- an exercise of contractual rights based upon a legitimate and lawfully obtained mortgage -- did not constitute a "wrongful use." But here, petitioners do not base the claims of financial elder abuse on real parties' action for specific performance; instead they base the claims on real parties' antecedent conduct in procuring Bounds' signature on multiple documents.

*means of an agreement*, donative transfer, or testamentary bequest, regardless of whether the property is held directly or by a representative of an elder." (Italics added.)

Case law recognizes that property rights are a complex "bundle of rights." (*Estate of Sigourney, supra,* 93 Cal.App.4th at p. 604.) That bundle includes the "rights to possess the property, *to use the property*, to exclude others from the property, and *to dispose of the property by sale* or by gift." (*Id.* at p. 603, italics added.) The SACC alleges significant impairment of petitioners' rights to use and to sell the property. It states that real parties' abusive conduct resulted in Bounds' execution of the LOI, the escrow instructions, and, apparently, a lease. The LOI and escrow instructions, which set forth the parties' understanding about their respective rights and duties in regard to the sale of the real property, clearly constitute agreements within the meaning of section 15610.30, subdivision (c). Further, in any sales or loan transaction concerning the property, petitioners would be required to disclose KMA's claim that it has a legally enforceable right to acquire the real property. (See *Lingsch v. Savage* (1963) 213 Cal.App.2d 729, 735 ["where the seller [of real property] knows of facts materially affecting the value or desirability of the property which are known or accessible only to him and also knows that such facts are not known to, or within the reach of the diligent attention and observation of the buyer, the seller is under a duty to disclose them to the buyer"].) This disclosure would, in turn, impair petitioners' ability to sell the real property for fair market value or to use it as security to obtain a loan on reasonable and commercially acceptable terms. The SACC thus alleges, in substance, that the existence of the escrow instructions significantly interferes with petitioners' rights to use the realty as they see fit. These allegations regarding the adverse financial impact of the escrow instructions are sufficient to allege a "depriv[ation] of [a] property right . . . by means of an agreement" (§ 15610.30, subd. (c)) because

13

petitioners have been deprived of one of the incidents of property ownership:  the right to strike the best bargain possible in either selling or encumbering the real property.

Real parties contend that under section 15610.30, a taking requires more than a significant impairment of a property right by means of an agreement.  It requires that that the elder be "deprived" of a property right (*id.,* subd. (c)), meaning that a transfer of title has occurred.  Thus, according to real parties, a claim of financial elder abuse lies "only when an elder is deprived of a property right by means of a *consummated agreement*, which resulted in a consummated transfer of the property described in the agreement."  In real parties' view, because petitioners retain title to the real property in question and have unrestricted use of it, their elder abuse claims fail.

Real parties' proposed interpretation of the Act's definition of financial elder abuse is troubling.  Under this interpretation, a person or entity who seeks to defraud an elder into transferring title to property, or to obtain title through undue influence, would be immune from the remedies available under the Act until the object of the abuse was achieved – a transfer of title from the elder to the abuser.  Only then, after having lost title to the property, could an elder invoke the Act.  For several reasons, we decline to take such a narrow view of financial elder abuse.

First, the argument would essentially rewrite the statutory language to read "by means of a *performed* agreement."  In interpreting the words in a statute, we must give them "the meaning they bear in ordinary use."  (*Blue v. Bontá* (2002) 99 Cal.App.4th 980, 989.)  Black's Law Dictionary defines an agreement as "[a] mutual understanding between two or more persons about their relative rights and duties regarding past or future performances."  (Black's Law Dict. (9th ed. 2009), p. 78.)  The definition's reference to "a mutual understanding" embraces both an unexecuted and performed agreement.  To construe the statutory language, as real

14

parties suggest – as referring only to a performed agreement -- would violate the cardinal principle that a court cannot, under the guise of construction, rewrite a law and give the words of a statute an effect different from the plain and direct import of the terms used.  (*Estate of Tkachuk* (1977) 73 Cal.App.3d 14, 18.)

Second, the Legislature enacted the Act, including the provision prohibiting a taking by undue influence, to protect elderly individuals with limited or declining cognitive abilities from overreaching conduct that resulted in a deprivation of their property rights.  (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 1140 (2007-2008 Reg. Sess.).)  To require the victim of financial elder abuse to wait to file suit until an agreement obtained through the statutorily proscribed conduct has been performed would not further that goal.

Third, real parties argue that because section 15610.30, subdivision (c) groups the language "by means of an agreement" with "by means of . . . donative transfer, or testamentary bequest" when it sets forth the ways in which an elder can be "deprived of any property right," the three situations should be construed in the same way.[5]  Real parties claim that because "'[d]onative transfer' and 'testamentary bequest' . . . refer to <u>consummated</u> transfers[,]" the statutory reference to "an agreement" should likewise be construed as referring to a consummated agreement.  However, as defined by law, the phrases "donative

---

[5]      In making this argument, real parties rely upon two rules of statutory construction. The first is the doctrine of *ejusdem generis*.  Under this rule """"where general words follow the enumeration of particular classes of person or things, the general words will be construed as applicable only to person or things of the same general nature or class as those enumerated.""""  (*O'Grady v. Superior Court* (2006) 139 Cal.App.4th 1423, 1461.)  The second is the doctrine of *noscitur a sociis* which provides that a term may be defined by reference to the fellow members of its class.  (*Blue v. Bontá, supra,* 99 Cal.App.4th at p. 989.)  These rules are aids to statutory construction, bearing in mind that "our first task . . . is to ascertain the intent of the Legislature so as to effectuate the purpose of the law."  (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386.)

15

transfer" and "testamentary bequest" refer not only to consummated transfers, but also to prospective transfers.

A donative transfer is a gratuitous transaction. It can be inter vivos or testamentary. In regard to an inter vivos gift of personal property, the gift is not complete (or consummated) until the donor has transferred the gift to the donee. (13 Witkin, Summary of Cal. Law (10th ed. 2005) Personal Property, §§ 124-137, pp. 139-150.) An inter vivos gift of real property is not complete until the requirements of making a valid conveyance by deed are met. (See in general 12 Witkin, Summary of Cal. Law (10th ed. 2005) Real Property, § 254, pp. 310-311.) A testamentary bequest (which is also a gratuitous transaction absent a contract to make a will) is merely an inchoate expectation on the part of the beneficiary because "[i]n California, a will is generally revocable by the testator at any time and for any reason prior to his or her death." (*Beckwith v. Dahl* (2012) 205 Cal.App.4th 1039, 1053.)

Thus, in context of this statute, the phrases "donative transfer" and "testamentary bequest" refer both to transactions that have been performed (the gift has been delivered and the testamentary bequest has taken effect) and to transactions that have not yet been performed (a promise to make a gift and a testamentary bequest has been made but the testator has not died). Assuming that real parties are correct that "by means of an agreement" should be construed in the same way as "donative transfer" and "testamentary bequest" (see fn. 5, *ante*), we construe the term "an agreement" to refer both to an agreement that has been performed and an agreement in which the promises are still executory.

Fourth, real parties contend that section 15657.6 supports their interpretation.[6]  In relevant part, the statute provides that an elder who lacks capacity can demand return of property after a taking, and also provides that if the property is not returned, the elder is entitled to specified damages including attorney fees.  Real parties argue that the statute's requirement that the property be returned means that an actual physical taking or change of ownership (e.g., performance of the agreement) must *always* occur before an elder can be deprived of a property right by means of an agreement.  We disagree.  That statute merely provides for the right of return under certain circumstances (or, in the absence of return, other remedies).  Its provisions do not mean that a property right can be taken *only* by a performed agreement.

B. *Adequacy of Factual Allegations*

Real parties challenge the factual adequacy of the allegations of financial elder abuse.  They argue that the SACC merely alleges a hypothetical possibility that petitioners might attempt to sell or encumber the real property, and that this is inadequate to allege the actual deprivation of a property right.  The argument overlooks the SACC's allegations that petitioners' ability to sell or encumber on the best possible financial terms has been taken by the escrow instructions.  As

---

[6]  The statute reads:  "A person or entity that takes, secretes, appropriates, obtains, or retains, or assists in taking, secreting, appropriating, obtaining, or retaining the real or personal property of an older or dependent adult when the elder or dependent adult lacks capacity pursuant to Section 812 of the Probate Code, or is of unsound mind, but not entirely without understanding, pursuant to Section 39 of the Civil Code, shall, upon demand by the elder or dependent adult or a representative of the elder or dependent adult, as defined in subdivision (d) of section 15610.30, return the property and if that person or entity fails to return the property, the elder or dependent adult shall be entitled to the remedies provided by Section 15657.5, including attorney's fees and costs.  This section shall not apply to any agreement entered into by an elder or dependent adult when the elder or dependent adult had capacity."

17

pled, the taking has occurred. At this pleading stage of the case, we must accept those allegations as true. (*Curcini v. County of Alameda, supra,* 164 Cal.App.4th at p. 633, fn. 3, and cases cited therein.) We do not question petitioners' ability to prove them. Real parties' argument that petitioners' claims are speculation and conjecture lacking evidentiary support frames an issue for trial, not demurrer. (*Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 214.)

Real parties also contend the SACC ignores allegations in the first amended cross-complaint (FACC) that petitioners' lawsuit is based upon real parties' filing their complaint for specific performance and recording a lis pendens, both of which are privileged actions. (See, e.g., *Continental Ins. Co. v. Lexington Ins. Co.* (1997) 55 Cal.App.4th 637, 646 ["'[A] plaintiff may not discard factual allegations of a prior complaint, or avoid them by contradictory averments, in a superseding amended pleading.'"].) The record does not support this argument.

The FACC alleged, among other points: "KMA and Kopykake nonetheless demanded that the Trust close the transaction forthwith at the grossly unfair price in the escrow instructions or be sued. This lawsuit followed shortly thereafter. [¶] The existence of the escrow instructions and lease, and KMA's and Kopykake's position with respect to them renders it impossible for Bounds to sell or borrow against the property and otherwise exercise the Trust's full rights to use and enjoyment of the Property. [¶] KMA and Kopykake have also filed a notice of pending action and are believed to have taken other actions to secure their claimed interests in the Property."

Real parties' demurrer to the FACC asserted, inter alia, that filing their complaint and recording a lis pendens could not provide the basis for a financial elder abuse claim because both actions are privileged. The trial court sustained the demurrer with leave to amend. Thereafter, petitioners filed the SACC which

18

alleges, in pertinent part: "[Petitioners] do not rely on the filing of the lawsuit or the filing of a lis pendens in any way to meet the elements of their claims and expressly disclaim reliance on any such allegations."

This record establishes that real parties' claim that petitioners are improperly trying to ignore allegations in the FACC is not well-founded. For one thing, the FACC's allegations, set forth above, did not explicitly state that petitioners were relying upon the filing of the lawsuit and recordation of the lis pendens to allege a financial elder abuse claim; instead the FACC alleged that the escrow instructions and KMA's position that it has a contractual right to buy the property deprived petitioners' of their right to use the real property. Further, a fair reading of the FACC indicates that petitioners' references to the lawsuit and lis pendens were made in the context of simply setting forth a chronology of the relevant events.

In any event, after real parties' demurrer pointed out that petitioners could not rely upon privileged actions to allege their claim, the trial court permitted petitioners to amend their pleading. (See, e.g., *Angie M. v. Superior Court* (1995) 37 Cal.App.4th 1217, 1227 [liberality in permitting a party to amend a pleading is the rule if a fair opportunity to correct the defect has not already been given and the pleading's deficiency can be easily corrected].) Thereafter, they filed the SACC which made clear that the causes of action for financial elder abuse were not based upon either the lawsuit for specific performance or the recordation of the lis pendens. It is therefore apparent that petitioners are not trying to ignore allegations in an earlier pleading. Instead, the record indicates that real parties' demurrer accomplished exactly what a demurrer should do: identifying a potential defect in a pleading (here, the cross-complaint) that was corrected. (See Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2014) ¶ 7:4.2, p. 7(I)-4 (rev. #1, 2013) "Strategy and Tactics Re Demurrers: Should You Demur?" ["If the defect in the complaint is correctable, the judge will

simply grant leave to amend, and in all probability plaintiff will eventually correct the defect."].)

In a related vein, we reject real parties' contention that their conduct is "absolutely privileged" because of the litigation privilege (Civ. Code, § 47). As explained above, petitioners are not relying upon privileged conduct to allege financial elder abuse. Instead, they rely upon real parties' abusive and deceptive actions in persuading Bounds to sign the LOI and escrow instructions. The mere fact that real parties sued petitioners first and filed a lis pendens does not immunize real parties from the claims for financial elder abuse as they are pled in the SACC.

## DISPOSITION

Let a peremptory writ of mandate issue compelling respondent court to vacate its order of December 26, 2013 sustaining without leave to amend real parties' demurrer to the first and second causes of action in the second amended cross-complaint and to enter a new and different order overruling the demurrer. Petitioners are to recover their costs in this proceeding. (Cal. Rules of Court, rule 8.493.)

**CERTIFIED FOR PUBLICATION**


WILLHITE, J.


We concur:



EPSTEIN, P. J.          MANELLA, J.

20