Filed 8/30/21  Horowitz v. Brown CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| LEONA HOROWITZ, Individually and as Trustee, etc., et al.<br><br>        Plaintiffs and Appellants,<br><br>        v.<br><br>JOSEPH G. BROWN et al.<br><br>        Defendants and Appellants. | G057412<br><br>(Super. Ct. No. 30-2013-00679652)<br><br>O P I N I O N |
| LEONA HOROWITZ, Individually and as Trustee, etc., et al.<br><br>        Plaintiffs and Respondents.<br><br>        v.<br><br>HUSITE, L.P. et al.<br><br>        Defendants and Appellants. | |

Appeals from an order of the Superior Court of Orange County, Walter P. Schwarm, Judge.  Affirmed in part, reversed in part and remanded with instructions.

Ferguson Case Orr Patterson LLP, Wendy C. Lascher and Joshua S. Hopstone for Defendants and Appellants Debbie A. Brown Marheine, Donna M. Brown Snider, and Joseph G. Brown.

George & Shields, LLP, Timothy F. Shields and Katherine K. Meleski for Defendants and Appellants Husite, L.P., Sure Save I, L.P., Pacific Medical Plaza, L.P. and Harbor 91 Limited Partnership.

Ervin Cohen & Jessup LLP, Geoffrey M. Gold, Jason L. Haas for Plaintiffs and Appellants and Plaintiffs and Respondents.

**INTRODUCTION**

In this complex, multi-party case, one plaintiff firmly established that she had been the victim of financial elder abuse on a massive scale, but only some of the defendants were found liable for it.  We enter the fray not to review the trial court's findings on liability, but to unspool numerous statutes and doctrines pertaining to its posttrial rulings on cross-motions for attorney fees and costs.  The primary threads on the spool, in our estimation, are three.  First, Welfare and Institutions Code section 15657.5, which requires the trial court to award a successful elder abuse plaintiff reasonable attorney fees and costs.[1]  (*Id.* at subd. (a).)  Second, Code of Civil Procedure section 1032, which entitles a statutorily-defined prevailing party to costs as a matter of right, "[e]xcept as otherwise expressly provided by statute[.]"  (*Id.* at subd. (b).)  And third, the equitable common fund and/or substantial benefit doctrines, especially as applied to Corporations Code section 15910.05, subdivision (b) to derivative actions on behalf of limited partnerships.

---

[1]  All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

The trial court is to be commended for the patience and thoughtfulness exhibited in piloting this matter through difficult waters. While we affirm some of the challenged rulings, we must reverse and remand others for further proceedings, but the lion's share of this lengthy opinion is spent explaining why we conclude the trial court got most of it right.

## FACTS

"Byzantine." Such was the word chosen by one of the cross-appellants, Leona Horowitz, to describe this litigation. The choice was apt, considering the case took five years from filing to judgment and covered a course of alleged misconduct spanning decades. Mindful of the legal and factual morass with which we are presented, our goal is to isolate only those facts and issues which are relevant to resolving the appeals.

Leona is an 81-year-old retired social worker who has no work experience in the field of real estate.[2] She was, however, married to someone who did: Ralph Horowitz, a real estate lawyer with whom she had three children, amongst them plaintiff and appellant/plaintiff and respondent Jill Groeschel, before divorcing.

Ralph invested in real estate with Harold Joseph "Joe" Brown, a licensed broker and property developer.[3] After the divorce, Ralph and Joe went their separate ways, but Leona continued to receive proceeds from the investments made during the couple's marriage. She became friends with Joe, and began asking for his advice on some of her financial matters. Eventually, Joe suggested he take charge of investing her money so she would not have to manage it.

All things considered, this was a mistake – not because the investments were unsuccessful, but because they resulted in entanglements that compromised Leona's

---

[2]    Because many individuals in this case are related to one another, we refer to them by their first names to more easily identify and distinguish them. We intend no disrespect.

[3]    Joe was a defendant in the proceedings below but is not a party to any of the three appeals.

3

control over her money. It resulted in the sowing of the seeds of the present litigation: a network of investments and entities formed largely at Joe's behest and financed by a consortium consisting of him, his children – defendants and appellants Debbie A. Brown Marheine, Donna M. Brown Snider, and Joseph G. "Joey" Brown (collectively, the Brown children) – their affiliates, and Leona. The entities – defendants and appellants Pacific Medical Plaza, L.P. (PMP); Husite, L.P. (Husite), and Harbor 91, L.P. (H91) (which is not a party to the appeal) – have consequently become financial footballs, if the briefing is any indication. But while the lawsuit itself alleged wrongdoing on a larger scale, its resolution requires that we focus only on a few transactions described below.[4]

All three jointly-owned entities were limited partnerships with the same basic structure. PMP was a limited partnership that was formed in April 2005 to own and manage real property, specifically, a commercial medical property in Costa Mesa called Pacific Medical Plaza (the PMP property). Husite and H91, too, owned property or did business in California. The general partner of each entity was another entity controlled by Debbie, Donna, and Joey called Brown Associates II, LLC (Brown II). Leona, Debbie, Donna, and Joey were each limited partners. Respondent Sure Save I, L.P. (Sure Save), an entity managed by Joey, was a limited partner in Husite as well. Joey, Debbie, and Donna were both general and limited partners in Sure Save and Leona was a limited partner.

Leona was also individually invested in parcels of real estate with the Browns. One was the Anchor Park trailer park in Costa Mesa, in which she and the Brown children had ownership interests. Another was the so-called Bumblebee property, a commercial tuna processing facility in Santa Fe Springs. Through her trust, Leona also owns her primary residence in Pacific Palisades.

---

[4] The trial court found Joe liable to Leona for financial elder abuse and numerous breaches of fiduciary duty during his time "tak[ing] care of [her] as [he] would [his] own family."

*Pacific Medical Plaza*

The PMP property was leased for use as a medical facility, and PMP had invested significant money in building out the space for such purpose. However, in 2011, one of its main tenants, Renaissance Surgery Center (Renaissance), went into bankruptcy, and its lease reverted to PMP. To recoup the loss, Joe wanted to reopen a new surgery center, Pacific Surgery Center (PSC), in Renaissance's stead – and quickly, before its accreditation expired.[5] Leases were drawn up between PSC, LLC (an entity managed by Joe), and PMP in 2012, for an undisclosed amount of rent.[6] Brown II, through Joey and Donna, signed the leases on behalf of PMP.

In February 2014, a presumably related company, Pacific Surgery Center Holdings, LLC (PSC Holdings) sold PSC's lease to a third party for $5.2 million, retaining proceeds of over $4.5 million. None of this money went to PMP or its partners, even though PMP owned the space. The trial court found Brown II and Joe had breached their fiduciary duties to PMP by allowing PSC to use and improve the space and sell the lease without PMP receiving any of the sale proceeds. Deducting amounts used on improvements, the court found a net profit of $2,373,900 from this sale, constituting an injury to PMP which harmed all of the partners equally. Even though Joey and Donna had signed the offending "sweetheart" leases on behalf of PMP, the trial court determined they had no personal liability for this transaction because they had no fiduciary duty to

---

[5]    It appears Joe and other Brown family members were also investors in Renaissance, so the loss of the tenant did not just involve the loss of rental income.

[6]    Leona alleged it was an under-market rate.

5

Leona.[7]  The trial court found PSC and PSC Holdings liable for aiding and abetting Brown II and Joe's breach.  However, it also found the injury from the PSC transaction was derivative in nature, so Leona was not directly awarded any damages for it.

*Husite Loan*

Husite's main function was owning and operating a property in Nevada which housed a commercial fitness facility.  Brown II took fees for managing the property, and the trial court did not find these fees illegitimate.  However, in 2011, Brown II caused Husite to borrow $3.2 million against its property which it then distributed to PMP and other Brown affiliated entities.  According to the trial court, this loan did not inure at all to Husite's benefit, as it received no interest once it disbursed the funds to the Brown entities, and there was no writing solidifying terms of repayment.  Indeed, the reverse occurred: Husite lost $3.2 million of equity in the property and loss of use of those funds on better investments.  Thus, the trial court found, Brown II breached its fiduciary duty to Husite.  But again, the damage was derivative, since the court found all Husite partners were equally damaged by the breach.  The court awarded Husite damages of $3.2 million plus prejudgment interest, but credited the $3.2 million because the originating bank was repaid before entry of judgment.

---

[7]     The basis for this determination seems a bit murky.  In part, the trial court cited to Corporations Code section 17703.04, which shielded all the members of Brown II from individual liability for acts committed on Brown II's behalf.  (*Id.* at subd. (a)(2) [Liabilities of the LLC "do not become the debts, obligations, or other liabilities of a member or manager solely by reason of the member acting as a member or manager acting as a manager for the limited liability company."].)  However, the statement of decision itself represents that Joey and Donna did not sign these leases on Brown II's behalf, but rather, on *PMP*'s as "managing partner[s]."  The PMP partnership agreement indicated Leona, Debbie, Joey, and Donna were its limited partners, and Brown II was the general partner.  Limited partners do not owe each other fiduciary duties as a matter of law (see Corp. Code, § 15903.05, subd. (a)), but this is because "limited partners have very limited power of any sort in the regular activities of the limited partnership and no power whatsoever justifying the imposition of fiduciary duties either to the limited partnership or fellow partners."  (6B West's U. Laws Ann. (2016) U. Limited Partnership Act, editors note for com. to § 15903.05, p. 88.)  And so it appears it should have been at PMP – the PMP partnership agreement pretty much precluded limited partners like Joey and Donna from acting for the partnership or taking part in its business.  Yet they purported to act as "managing partners" for PMP in signing the PSC leases, thus potentially catapulting their relationship with Leona into a realm more fiduciary in nature.  Our thoughts on this issue must remain wholly academic, however, as Leona has not substantively challenged the statement of decision on appeal.

6

In her pleading, Leona had also alleged the Browns themselves received personal distributions from these loan proceeds, and there was conflicting evidence at trial as to whether this occurred.[8]  The statement of decision made no conclusions as to whether any wrongful distributions were made from the loan.

*The Bumblebee Property*

The Bumblebee property was purchased in February 2004 by Leona along with H91 and the Brown children as tenants-in-common.  In the summer of 2012, Joe sought to extract equity from this property (which, we note, he did not even own) in order to shore up PMP.  So the Brown children signed a loan agreement on behalf of H91 and another Brown affiliated entity, defendant 1400 E. Foothill, L.P. (Foothill), to borrow $2.6 million against the property with themselves, Joe, and Leona as individual guarantors.

The evidence showed Leona was not at all comfortable acting as a guarantor for this loan, and indeed, the transaction appeared to be the first time Leona realized Joe might not be acting with her best interest in mind.  On August 6, 2012, Leona had an e-mail conversation with Joe.  She said she was "scared out of [her] mind" that she was putting her savings and holdings at risk by signing the guarantee, and she asked him to assure her she was not in fact doing that.  She "just want[ed] to understand" what she was being asked to do in the transaction.  Joe initially responded with anger, telling her she was being "inaccurate" and "put[ting] words in [his] mouth."  He then attempted to appeal to her confidence in him, saying he had "protected [her] and [her] family [and] provided [her with] a lifestyle" for the previous 30 years.  Leona was concerned enough to enlist a close friend, Trevor Grimm, to attempt to gather information from Joe about her investments, at which time, Joe began threatening to cut off Leona's usual monthly payments from those investments, which she was using at the

---

8        Joey testified some of the funds were "park[ed]" in an account in Debbie and Donna's names. However, the Browns' accountant, Amy Thompson, claimed the funds eventually ended up going to PMP.

7

time to keep up the mortgage on her house. A little over a year later, this lawsuit was filed. Joe nonetheless signed the guarantee agreement on her behalf; the trial court reasonably determined this was a breach of his fiduciary duty to her and constituted financial elder abuse.

In December 2012, the Bumblebee property was sold for $10.75 million and the $2.6 million loan was paid off. But the trial court found the removal of $2.6 million in equity from the property damaged Leona because she received no benefit from guaranteeing the loan, and thus lost her share of that equity in the sale.

The Brown children and H91 were deemed liable for financial elder abuse and breach of fiduciary duty as cotenants for taking Leona's share of that equity after the sale. The court found they were liable for approximately $224,000 in damages.

However, the court credited against those damages a stipulated $376,000 payment the Brown children had made to Leona early in the litigation. Back in January 2014, Leona had obtained the right to attach $1.225 million in PMP and Brown II property in service of her claims in the lawsuit. In exchange for $376,000 and other payments described in the stipulation, Leona and Jill had agreed in August 2014 not to attach any further PMP or Brown II assets. This payment was not couched as an offer of compromise under Code of Civil Procedure section 998. At the close of trial, the court found the Brown children had engaged in financial elder abuse by in the handling of the Bumblebee loan and sale, but because of the stipulated payment, Leona walked away with no money in hand as to the claim.

*The Lawsuit*

Leona's original complaint was brought on behalf of herself and her trust against Joe, Brown II, and PMP and stated causes of action for financial elder abuse, breach of fiduciary duty, breach of oral contract, common counts, and accounting. But as discovery proceeded, the pleading went through five amendments and by the time of trial, it was in its sixth iteration. Jill was now also a plaintiff, and the cadre of defendants

8

numbered 15, including Joey, Debbie, Donna, Husite, Sure Save, PSC, PSC Holdings, Foothill, and another Brown-related entity, New Brown Corporation (New Brown). The claims had also expanded significantly to a total of 13.

In addition to her original claims, Leona alleged that all defendants had aided and abetted Joe's and Brown II's breaches and converted her payments and distributions through various transactions. She accused all defendants of financial elder abuse, including the entities in which she was invested: H91, along with the Brown children, had taken more than its share from the Bumblebee property sale. Husite and Sure Save had distributed the proceeds of the $3.2 million loan amongst the Browns and their entities, without giving her a share.

She also brought a claim for declaratory relief against these entities, arguing the circumstances (transfers and loans, contributions, and Joe's representations) might warrant adjusting her stake in all the partnerships. She asked the court to make a judicial determination of each partner's interest in each entity and how much extra she was owed in distributions thereby. She wished to remove Brown II, Debbie, Donna, and Joey from management of the partnerships on account of their self-dealing. And she wanted the PMP property sold so she could recoup amounts she invested in it at Joe's request.

Jill's only involvement in the case was the fifth and sixth claims for breach of contract and common counts. Her claim was against Joe, Brown II and Foothill. She alleged Joe had asked her for a $190,000 loan many years before, for which Foothill and/or himself and Brown II were liable. The trial court found Jill had in fact been repaid pursuant to the parties' agreement and she did not prevail on her claims.

Beginning with her third amended complaint, Leona proclaimed she was seeking relief in the derivative "[t]o the extent required" to protect the partnership property of PMP, H91, Sure Site, and Husite, whom she named as nominal defendants. These entities obtained counsel of their own, and filed a motion to compel Leona to elect

9

between her individual and derivative theories, because her filings had indicated she was both suing for their benefit *and* seeking to collect a large money judgment against them simultaneously. They argued she could not do this; either she had to elect between the theories, or the trial court had to dismiss the derivative claims. The trial court deferred a ruling, saying it wished to hear the evidence in order to determine if the claims were direct or derivative.

After a bench trial spanning what we can only imagine was an exhausting 51 days, the trial court's final statement of decision, 80 pages in length, issued on May 31, 2018. We have already touched upon its most important conclusions above. The judgment, a mixed bag in terms of relief, was entered on June 5, 2018. Leona had large recoveries against Joe, Brown II, and PMP on her financial elder abuse claim, but recovered nothing as against the Brown children after the $376,000 payment was credited. Judgment was for Husite, Sure Save, and H91 on the elder abuse claim. Leona was also unsuccessful on her contract claim against Joe, Brown II, and PMP and her declaratory relief claim as to all defendants except H91 and PMP. As noted above, Jill was unsuccessful on all claims.

The court found that four of Leona's causes of action were partly direct and partly derivative in nature.

Breach of fiduciary duty was a claim premised on multiple transactions. Leona was successful in a direct capacity against Joe, Brown II, and the Brown children (even though she acquired no actual monetary recovery against the latter). She obtained a derivative recovery of over $1.3 million for Husite against Brown II, and over $3.3 million for PMP from Joe and Brown II.

On aiding and abetting breach of fiduciary duty, Leona's direct claims against Sure Save, H91, and Husite were unsuccessful, but she obtained a derivative recovery for PMP of over $3 million from PSC and PSC Holdings.

10

On conversion, Leona was successful against the Brown children and H91 based on the Bumblebee transaction but, as already explained, recovered nothing. She was unsuccessful against Joe, Brown II, PMP, Husite, Sure Save, Foothill, New Brown, PSC and PSC Holdings. None of the four partnerships obtained a recovery on this claim in a derivative capacity. And neither Leona nor the partnerships were successful on her equitable relief claim.

As to Leona's unfair business practices claim, she was successful only against PMP, Brown II, and Joe. None of the four partnerships recovered in a derivative capacity.

*Posttrial Motions*

After a complex and demanding trial came a stream of costs memoranda, motions to strike or tax them, and motions for attorney fees: a total of 11 in all. We discuss only those implicated by this appeal. In a bit of a head-scratcher given the court's findings, Joe, his children, PSC, PSC Holdings, Brown II, and New Brown sought to recover their costs. Plaintiffs also filed a memorandum of costs, as did Husite and Sure Save together.

Leona filed two motions for attorney fees, one for her direct claims (Motion 1) and one for her derivative claims (Motion 2). Her counsel, Geoffrey Gold, filed a declaration breaking down the fees sought into four categories: (1) those incurred on Leona's direct claims regarding PMP, recoverable from Brown II, PMP, and Joe (over $1.1 million), (2) those incurred on Leona's direct claims related to the Bumblebee property, recoverable from the Brown children ($462,396.77), (3) those incurred prosecuting derivative claims on Husite's behalf, recoverable from Husite and Brown II ($441,711.77), and (4) those incurred prosecuting derivative claims on PMP's behalf, recoverable from Husite and Brown II ($467,083.97).

11

The Gold declaration provided charts allocating fees between these categories as between the various defendants. It also discussed each phase of the litigation in an effort to assist the trial court in allocating and calculating fees.

Motion 1 was based primarily on section 15657.5, the elder abuse costs and fees statute, although Leona did seek expert fees under the PMP partnership agreement in the alternative. On Motion 2, she sought 30 percent of the Husite judgment to compensate her for attorney fees expended on its behalf. Alternatively, she sought attorney fees and costs under the PMP and Husite partnership agreements against Brown II "assuming that either or both of the . . . Agreements [we]re given effect." She noted the court had discretion to award her attorney fees from Husite's own recovery under Corporations Code section 15910.05 and the common fund and/or substantial benefit doctrines.[9] Citing *Cziraki v. Thunder Cats, Inc.* (2003) 111 Cal.App.4th 552 (*Cziraki*), *Baker v. Pratt* (1986) 176 Cal.App.3d 370 (*Baker*), and this court's decision in *Avikian v. WTC Financial Corp.* (2002) 98 Cal.App.4th 1108 (*Avikian*), Husite and PMP argued Leona could not recover such fees because her objective throughout the litigation was not to advance the entities' interests, but her own.

The Brown children filed a motion to strike or tax plaintiffs' memorandum of costs (Motion 4). They said Jill had not prevailed and was not entitled to costs. And Leona was not a prevailing party because she had no monetary recovery.

Husite and Sure Save sought attorney fees from Leona pursuant to provisions in their respective partnership agreements, arguing section 15657.5 did not bar them from recovering contractual fees (Motion 7). Leona opposed. She also filed a motion to strike or tax Husite and Sure Save's memorandum of costs, arguing they were not prevailing parties because of the derivative recovery she obtained (Motion 8). They

---

9       Section 15910.05, subdivision (b) of the Corporations Code states: "If a derivative action is successful in whole or in part, the court may award the plaintiff reasonable expenses, including reasonable attorney's fees, from the recovery of the limited partnership."

12

sought to strike her memorandum of costs in Motion 3, arguing she did not prevail against them.

In Motion 10, the Brown children pursued over $1.2 million in attorney fees from Leona based on the partnership agreements, claiming the outcome of the litigation had made them prevailing parties under Code of Civil Procedure section 1032. Leona opposed, and she and Jill filed a motion to strike or tax the memorandum of costs filed by Joe, his children, Brown II, New Brown, Foothill, and the PSC entities (Motion 11). They argued Joe, Brown II, and the PSC entities lost on some claims, and thus could not be prevailing parties under Code of Civil Procedure section 1032. The Brown children were liable for financial elder abuse and thus owed Leona her costs. As to New Brown and Foothill, plaintiffs asked that costs be apportioned, since the majority of costs incurred did not pertain to those entities.

The rulings were issued in one minute order. On Motion 1, Joe, Brown II, and PMP were ordered to pay over $1 million in Leona's attorney fees, and the Brown children were ordered to pay $411,955.07, for which they were jointly and severally liable. The trial court denied Motion 2, agreeing with Husite that Leona had acted for personal benefit under *Cziraki*, *Baker*, and *Avikian* and so was not entitled to fees on the derivative victories. It granted Motion 3, deciding Leona had not prevailed against Husite or Sure Save. However, it also denied Motions 7 and 10. Relying on *Wood v. Santa Monica Escrow Co.* (2007) 151 Cal.App.4th 1186 (*Wood*), it concluded it had no authority to award Husite contractual attorney fees because all of Leona's claims against Husite and Sure Save were factually overlapping with her financial elder abuse claim against them, which was governed by section 15657.5.[10]

---

[10] The court also ruled Sure Save could not recover contractual fees because the fee provision in its partnership agreement did not encompass the present dispute. We find this point moot because we conclude Sure Save could not recover fees even if the provision did encompass the dispute.

13

As for Motions 8 and 11, the court determined Husite, Sure Save, the PSC entities, and New Brown were all prevailing parties as against Leona and could recover costs. But its rulings on Motions 4 and 11 as it pertained to the Brown children were internally contradictory. The court denied Motion 4 because, pursuant to section 15657.5, Leona was entitled to recover costs. However, it declined to strike the Brown children's memorandum of costs in Motion 11, finding they were prevailing parties under Code of Civil Procedure section 1032 because they had "obtained a net monetary relief" against Leona. The trial court did not address apportionment of costs from this memorandum.

Leona, Jill, Husite, Sure Save, and the Brown children all now appeal the rulings with respect to Motions 1, 2, 3, 7, 8, 10, and 11.

## DISCUSSION

There are knots within knots to be untangled here. First, the Brown children claim they should not have been liable for attorney fees because Leona walked away with nothing in the judgment. In fact, they assert they are the ones entitled to fees pursuant to fee provisions in the H91, PMP, and Husite partnership agreements. Husite and Sure Save similarly claim contractual entitlement to attorney fees based on the respective partnership agreements, but they also argue they are not liable for Leona's attorney fees incurred on the successful derivative causes of action. And Leona contends the trial court erred in failing to award her attorney fees under the equitable common fund or substantial benefit doctrines for her derivative success on behalf of Husite.[11] But she does not want to pay costs for those causes of action on which she was unsuccessful. Both Leona and Jill also claim the court erred in some of its costs awards under Code of Civil Procedure section 1032, subdivision (a)(4).

---

[11]    In her opening brief, Leona sought fees against both PMP and Husite based on this argument, but abandoned the quest against PMP in her reply brief. Accordingly, we analyze her argument only as it relates to Husite.

14

## I.        Standard of Review

As we have observed, abuse of discretion is generally the standard of review for a trial court's award or denial of attorney fees after trial, except "'"'"where the determination of whether the criteria for an award of attorney fees and costs in this context have been satisfied amounts to statutory construction and a question of law."'"' [Citation.]" (*Sandlin v. McLaughlin* (2020) 50 Cal.App.5th 805, 828-829.)  In such event, our review is de novo.  (See *Collins v. City of Los Angeles* (2012) 205 Cal.App.4th 140, 152.)  "Whether a party falls within one of the four categories authorizing the recovery of costs as a matter of right is a question of law we review de novo. [Citations.] We otherwise review a trial court's cost award for abuse of discretion. [Citations.]" (*Charton v. Harkey* (2016) 247 Cal.App.4th 730, 739 (*Charton*).)

## II.        The Trial Court's Rulings on Attorney Fees

There are two main factors a trial court must consider in deciding a motion for attorney fees.  First, since attorney fees are not available to the prevailing party as a matter of right, the court must ascertain whether a valid basis exists for an attorney fee award in the moving party's favor.  (See Code Civ. Proc., § 1021.)  Second, it must determine a reasonable amount of fees to be awarded once a valid basis is established. Generally speaking, the party seeking attorney fees has the burden of proof on both issues.   (See *Corbett v. Hayward Dodge, Inc*. (2004) 119 Cal.App.4th 915, 926; see also *Center for Biological Diversity v. County of San Bernardino* (2010) 188 Cal.App.4th 603, 615.)

### A.        Entitlement to Attorney Fees

The four potential bases for recovery of attorney fees in this case were section 15657.5, the common fund doctrine and/or its close relative, the substantial benefit doctrine, and the partnership agreements.  As to the direct claims by Leona, we agree with the trial court that section 15657.5 has primacy in the analysis, and because of it, the contractual fee provisions do not apply. As to Leona's derivative claims, we

15

conclude the trial court abused its discretion in denying reimbursement of her attorney fees under the common fund doctrine.

### 1. Direct Claims: Section 15657.5

Under the statute's fee-shifting provision, any defendant proven by a preponderance of the evidence to be "liable for financial abuse" must pay the plaintiff's reasonable attorney fees and costs. (§ 15657.5, subd. (a).) A defendant is not entitled to reciprocal attorney fees should it prevail on a financial elder abuse claim. (*Bates v. Presbyterian Intercommunity Hospital, Inc.* (2012) 204 Cal.App.4th 210, 216 (*Bates*).) "Such nonreciprocal fee provisions 'are created by legislators as a deliberate stratagem for advancing some public purpose, usually by encouraging more effective enforcement of some important public policy.' [Citations.]" (*Carver v. Chevron U.S.A., Inc.* (2004) 119 Cal.App.4th 498, 504 (*Carver*); see also *Bates*, *supra*, 204 Cal.App.4th at pp. 216-217.)

"Some courts have taken an additional step and concluded that where all of a plaintiff's claims are closely related to claims falling under a statutory scheme with a one-way attorney fee provision, a successful defendant may not recover fees even where another relevant statutory or contractual provision would arguably permit the court to award them." (*Bates*, *supra*, 204 Cal.App.4th at p. 217, citing *Carver*, *supra*, 119 Cal.App.4th at pp. 503-506 [discussing the Cartwright Act's one-way fee provision, Business & Professions Code, § 16750, subd. (a)] and *Wood*, *supra*, 151 Cal.App.4th at p. 1191 [discussing section 15657.5].) These courts believe allowing prevailing defendants to recover attorney fees for work on the statutory issues "simply because the statutory claims have some arguable benefit to other aspects of the case would superimpose a judicially declared principle of reciprocity on the statute's fee provision, a result unintended by the Legislature, and would thereby frustrate the legislative intent to 'encourage improved enforcement of public policy.' [Citation.]" (*Carver*, *supra*, 119 Cal.App.4th at p. 504.) Thus, where all causes of action overlap with an elder abuse

16

cause of action, the prevailing defendant is not entitled to an attorney fee award. (See *Wood*, *supra*, 151 Cal.App.4th at p. 1191.)

### a) Brown Children (Motions 1 and 10)

The trial court found against the Brown children on Leona's elder abuse claim, at least with respect to the sale of the Bumblebee property. They do not dispute this. But they argue the trial court incorrectly applied section 15657.5 in a vacuum, without consideration of Code of Civil Procedure section 1032, which states in subdivision (b) as follows: "Except as otherwise expressly provided by statute, a prevailing party is entitled as a matter of right to recover costs in any action or proceeding." The subdivision preceding defines a "prevailing party" as, amongst other things, "the party with a net monetary recovery" and "a defendant as against those plaintiffs who do not recover any relief against that defendant." (Code Civ. Proc., § 1032, subd. (a)(4).) Citing to *Sanders v. Lawson* (2008) 164 Cal.App.4th 434 (*Sanders*), the Brown children argue section 15657.5 merely "invokes application of Code of Civil Procedure section 1032, and by reference, the cost list in Code of Civil Procedure section 1033.5." (*Id*. at p. 439.) And because Leona did not actually recover any relief against them, she is not the prevailing party – under either statute – and cannot recover her costs, including attorney fees.

This is a dubious manipulation of language in the statutes and in *Sanders*. First, the quoted language from *Sanders* is either inartfully worded or simply inapposite. It was discussing whether a prevailing plaintiff could recover *trustee's* fees as an item of costs, not attorney fees. (*Sanders*, *supra*, 164 Cal.App.4th at pp. 438-439.)[12] Neither statute explicitly addresses trustee's fees. But as to attorney fees and costs in general, both statutes are crystal clear. The prevailing party determination for costs under

---

[12] There was an award of attorney fees in *Sanders*, and the Second District Court of Appeal determined it was "[e]rroneous," but the portion of the opinion analyzing the attorney fee award is not published. (*Id*. at p. 438.)

17

subdivision (a)(4) of Code of Civil Procedure section 1032 applies "[e]xcept as otherwise expressly provided by statute[.]" (*Id.* at subd. (b).) The statute expressly providing otherwise in this instance is section 15657.5; it requires an award of both attorney fees *and* costs against any defendant shown to be liable for financial abuse. (*Id.* at subd. (a).) The trial court was on the money, so to speak, in applying section 15657.5 and not Code of Civil Procedure section 1032 to the Brown children.

They also erroneously contend they were not held "liable" for financial abuse because liability requires harm or damage, and Leona's outcome against them meant there was none. This, too, we find to be a distortion of the statutory language. Liability under section 15657.5 infers responsibility.[13] The trial court clearly found the Brown children responsible for the act of taking Leona's equity from the Bumblebee property. It merely credited the stipulated payment against her damages. This does not eliminate the Brown children's responsibility for the wrong.

And, in point of fact, Leona's outcome against the Brown children existed only because *they* had already paid her the damages the trial court ultimately determined they owed. This distinguishes the case from one like *Goodman v. Lozano* (2010) 47 Cal.4th 1327 (*Goodman*), which the Brown children cited in the trial court and here.[14] The prevailing defendants in *Goodman* had not paid *any* monies to the plaintiff at all, prior to the trial or after. Instead, they had extended an offer under Code of Civil Procedure section 998 which the plaintiffs had rejected. (*Id.* at p. 1331.) The other defendants in the case had paid settlement monies to the plaintiffs prior to trial, and the trial court offset those monies from plaintiffs' damages. (*Ibid.*) Under those circumstances, the non-settling defendants had clearly prevailed because they had paid

---

[13] The dictionary definition for "liable" in this context is "bound or obligated according to law or equity" or "responsible" or "answerable." (Webster's 3d New Internat. Dict. (1981) p. 1302.) Black's Law Dictionary takes a similar view, defining "liable" as: "[r]esponsible or answerable in law; legally obligated." (Black's Law Dict. (11th ed. 2019) p. 1099.)

[14] Another distinguishing factor was *Goodman* did not involve a fee-shifting statute like section 15657.5.

18

nothing. It defies credulity to accord the Brown children the same status just because they paid damages earlier in the litigation than they otherwise would have.[15]

Our conclusion is further strengthened by a recent decision out of Division Two of this district, *Arace v. Medico Investments, LLC* (2020) 48 Cal.App.5th 977 (*Arace*). The jury in *Arace* found for the plaintiff but awarded her no damages on her elder abuse claim. (*Id.* at p. 981.) The defendant appealed the award of attorney fees in her favor. Division Two held that section 15657.5 was "not discretionary in nature," requiring the trial court to award attorney fees as "a mandatory form of relief regardless of whether the plaintiff is awarded any other form of relief." (*Id.* at p. 983.) We agree with our sister court's construction of the statute.

The reasoning of *Carver* and *Wood* also forecloses an attorney fee award in favor of the Brown children for those non-statutory claims on which they were successful. The trial court correctly observed that all of Leona's claims against them were based on an interconnected set of facts – though unlike *Wood*, the claims pertained to multiple transactions, rather than just one. (See *Wood*, *supra*, 151 Cal.App.4th at p. 1191.) But importantly, each of the transactions alleged in this case was part and parcel of Joe's overall effort to gain and exert control over Leona's money so that it would be available to help fund the family's commercial and real estate ventures – PMP in particular. And while Joe and Brown II were primarily held liable for that scheme – the Brown children were facilitators. They were the managing members of Brown II, and Joey admitted he and Joe were its "decision makers." Joey and Debbie were willing to sign whatever Joe wanted them to sign.[16] The Brown children were also deeply involved in PMP. They were the only other three partners along with Brown II and Leona.

---

[15] The Brown children paid this amount in order to avoid further attachment of their property, not to settle the case, as they have continuously asserted. And even if they did pay this amount to settle the case, their payment would constitute a net monetary recovery for Leona under Code of Civil Procedure section 1032, subdivision (a)(4). (See *DeSaulles v. Community Hospital of Monterey Peninsula* (2016) 62 Cal.4th 1140, 1144.)

[16] It appears Donna was as well since she and Joey signed the sweetheart lease agreements with Joe's PSC entities.

We also note that the only reason the trial court found for the Brown children on most of the transactions was because it concluded they were not Leona's fiduciaries and thus owed her no duties.[17]  It was not because the trial court found they had no involvement.  In this light, the result was not the vindication the Brown children claim it was.  Because all claims in the lawsuit were inextricably connected to the financial abuse scheme, the Brown children cannot recover attorney fees under the contracts and Motion 10 was properly denied.

       **b)**  **Husite and Sure Save (Motion 7)**

Husite and Sure Save take a different tack.  They say Leona's claim against them was not a financial elder abuse claim at all, but merely a shareholder derivative action masquerading as a financial elder abuse claim.  Under *Hilliard v. Harbour* (2017) 12 Cal.App.5th 1006 (*Hilliard*), they contend, Leona should not be immunized by section 15657.5 or *Wood* from paying prevailing party attorney fees under the partnership agreements, because she did not allege or prove conduct amounting to financial elder abuse on their part.  They are wrong.

To start, Leona's operative pleading *did* allege financial elder abuse directly against both Husite and Sure Save.  She alleged they had "distributed to the Browns but not Plaintiff the proceeds of the loan, failing to give Plaintiff her" rightful share.  This is an allegation of unequal distributions or "disguised dividends," which is individual, not derivative, in nature.  (*See Jara v. Suprema Meats, Inc.* (2004) 121 Cal.App.4th 1238, 1258-1259.)  It details an alleged injury that was not inflicted *on* the entities, but *by* the entities.[18]  And this allegation was sufficient to state a claim for financial elder abuse

---

17  Interestingly, a fiduciary relationship is not a required element of financial elder abuse.  (See § 15610.30.)  But, again, the findings themselves were not appealed.

18  Sure Save had a 29.9 percent interest as a limited partner in Husite.  Leona had a 50 percent interest in Sure Save.  She alleged Husite distributed loan proceeds to all of its partners (Sure Save included) except her.  In turn, Sure Save made distributions to all of its partners except her.  Those partners were the Brown children.  We do not opine on the merit of these allegations – only that they were in fact alleged, thus refuting Sure Save's representation that there were no "specific factual allegations against it" in the complaint.

against both entities – i.e., an appropriation of property of an elder for a wrongful use. (See § 15610.30, subd. (a)(1).) In the final decision, the trial court apparently did not find this allegation meritorious. But this does not mean Leona failed to allege it.

Moreover, the gravamen of the lawsuit sounds in financial elder abuse, so *Hilliard* does not provide a useful analogy.[19] In *Hilliard*, the plaintiff was the controlling shareholder, and presumably the founder of, several companies. (*Hilliard*, *supra*, 12 Cal.App.5th at p. 1008.) The companies took out loans from Wells Fargo over the years, secured by their assets. At a certain point, the loans went into default and plaintiff Hilliard began negotiating with Harbour, Wells Fargo's representative, about liquidating certain personal interests and providing further collateral in order to satisfy the debt. (*Id.* at pp. 1008-1009.) In final settlement of the debt, Hilliard agreed to sell a radio station by a date certain and give Wells Fargo the proceeds. However, he was unable to sell the radio station by that date, and Wells Fargo sold the loan to a new creditor, who instituted legal action against the companies and ultimately obtained a judgment. (*Id.* at pp. 1009-1010.) Hilliard filed a complaint with a single cause of action for financial elder abuse, alleging Wells Fargo took the companies from him for a wrongful use. (*Id.* at p. 1010.) Wells Fargo and Harbour filed a demurrer, claiming Hilliard lacked standing because his claim was derivative and not personal, and the trial court sustained it without leave to amend. (*Ibid.*)

The appellate court affirmed, and in the process, extensively discussed *Sutter v. General Petroleum Corp.* (1946) 28 Cal.2d 525 (*Sutter*) as an example of a viable direct action for fraud in the shareholder context. (*Hilliard*, *supra*, 12 Cal.App.5th at pp. 1013-1014.) In contrast to *Sutter*, where the shareholder was defrauded into forming a corporation and investing money in a project which eventually met its demise, Hilliard had not been induced to form the debtor companies. (*Id.* at pp. 1014-1015.)

---

[19] Leona points out *Hilliard* is also distinguishable because it was decided on demurrer. While this is true, it is not the main reason we find *Hilliard* unpersuasive.

Those companies already existed and "[b]ut for his shareholder status, Hilliard would not have been injured by Harbour's conduct and that of the Bank." (*Id*. at p. 1015.) The court went on to state: "Nothing in the [Elder Abuse] Act, its legislative history, or the cases interpreting the measure suggest it was designed to confer on elders broader standing to sue than allowed by the legal principle applied in *Nelson* [*v. Anderson* (1999) 72 Cal.App.4th 111, 124]. Hilliard created the Companies as an LLC in order to limit his liability; there is no policy reason to permit him to enjoy the benefits of that limitation without accepting the concomitant burdens it entails." (*Id*. at p. 1015.)

Leona's claims align more with *Sutter* than *Hilliard*. She did not independently form or invest in Husite. She was advised by Joe to invest in it. It was but one vehicle through which he consolidated his control over her money. She did not even sign the Husite partnership agreement; the trial court found she had authorized Joe to act as her agent with respect to such matters and she had ratified the agreement by accepting partnership distributions. As in *Sutter*, the damages may have been represented (at least in part) by a diminution in the value of Leona's interest, but they flowed from a set of abusive circumstances which preceded her interest. (See *Hilliard*, *supra*, 12 Cal.App.5th at p. 1014 ["The point of the Supreme Court opinion is that while Sutter lost his investment, which was represented by the value of the stock, and its reduction in value was the measure of his loss, the damages all flowed from the defendants' tort that preceded and induced the investment"], citing *Sutter*, *supra*, 28 Cal.2d at p. 531.) Because of this, we have difficulty viewing this particular transaction in a vacuum, as Husite and Sure Save seem to be urging.

At its heart, Leona's fundamental claim against Husite and Sure Save was that they too participated in the elder abuse scheme by making unfair or unequal distributions to the defendant partners. This was the allegation behind all causes of

22

action against them in the sixth amended complaint.[20]  As such, the reasoning of *Wood* and *Carver* applies:  Husite and Sure Save cannot recover contractual attorney fees.[21]

## 2. Derivative Claims (Motion 2)

We now turn to Motion 2, Leona's request for fees on the successful derivative claim she brought on behalf of Husite, by which it recovered a judgment of over $1 million against Brown II.[22]  The trial court declined Leona's invitation to apply the common fund or substantial benefit doctrines to award her fees as a representative plaintiff, and we believe this was an abuse of discretion.

These doctrines grew out of the equitable principle, recognized in *Trustees v. Greenough* (1881) 105 U.S. 527, that a person securing a fund from which a common group of persons may benefit should be reimbursed the expenses of having done so from the fund itself, and barring that, from proportionate contributions from those who stand to benefit.  (*Id*. at p. 532.)  This principle is based on three main considerations: (1) "fairness to the successful litigant, who might otherwise receive no benefit because his recovery might be consumed by the expenses," (2) "correlative prevention of an unfair advantage to the others who are entitled to share in the fund and who should bear their share of the burden of its recovery," and (3) "encouragement of the attorney for the successful litigant, who will be more willing to undertake and diligently prosecute proper

---

[20]  Husite and Sure Save argue the declaratory relief cause of action is unrelated to the elder abuse claim, but through it, Leona merely sought a determination as to whether an adjustment of ownership interests in all of the partnerships was required due to the elder abuse.

[21]  For this reason, we need not reach Husite's and Sure Save's arguments concerning the interpretation of the fee provisions in the respective partnership agreements.

[22]  In the statement of decision, the trial court indicated Husite's damages for the loss of its equity were $3.2 million.  But Husite was only awarded $1,306,138.02 in the judgment.

We decline to consider Leona's appeal of her request for attorney fees against Brown II pursuant to the Husite or PMP partnership agreements.  Contrary to Leona's suggestion, the trial court did not "fail to decide" the issue.  Rather, Leona failed to properly preserve it.  (See *Black v. Financial Freedom Senior Funding Corp.* (2001) 92 Cal.App.4th 917, 925, fn. 9.)  The trial court ruled Leona's memorandum of points and authorities was insufficient to bring the issue to the court's and opposing counsel's attention under California Rules of Court, rule 3.1113.  Leona claims the lack of any opposition to the request from Brown II was enough to grant it, but the trial court was clearly not satisfied anyone – including it – had received adequate notice of the argument based on the barebones, one-paragraph treatment it was given in her moving papers.  We will not disturb its judgment in that regard.

23

litigation for the protection or recovery of the fund if he is assured that he will be promptly and directly compensated should his efforts be successful." (*Estate of Stauffer* (1959) 53 Cal.2d 124, 132 (*Stauffer*).)

"The substantial benefit theory is derived from the common fund principle. A litigant whose action has been responsible for conferring on a group substantial nonpecuniary benefits may similarly be awarded his attorneys' fees. The earliest California case employing this theory (*Fletcher v. A. J. Industries, Inc.* [(1968)] 266 Cal.App.2d 313 [(*Fletcher*)]) involved a corporate derivative action. The efforts of the stockholder plaintiffs, while not resulting in a common fund of money, produced significant benefits in the form of changes in corporate management policies or procedures – corporate therapeutics (*Mills v. Electric Auto-Lite* (1970) 396 U.S. 375, 396) – which inured to the benefit of all shareholders. By awarding fees payable by the defendant corporation the costs of suit were spread among those who benefited thereby – the shareholders." (*Coalition for L.A. County Planning etc. Interest v. Board of Supervisors* (1977) 76 Cal.App.3d 241, 247.)

The common fund doctrine was approved by the California Supreme Court in the corporate shareholder context in *Fox v. Hale & Norcross S. M. Co.* (1895) 108 Cal. 475 (*Fox*), the high court stating as follows: "The action was not prosecuted by the plaintiff in his own right or for his own exclusive benefit. He sued in behalf of the corporation to recover a fund in which others were equally interested, and the judgment in his favor was for the use and benefit of the corporation. He was, therefore, not entitled to receive the amount of the judgment himself, but clearly was entitled to an allowance out of the moneys collected of his reasonable expenses, including counsel fees." (*Id.* at p. 477.) Thus, even from its inception, courts have recognized that the common fund doctrine can be limited by the extent to which the party seeking fees pursues the litigation for her exclusive benefit or adverse personal interest.

24

The California Supreme Court provided a good example of an adverse personal interest in *Gabrielson v. City of Long Beach* (1961) 56 Cal.2d 224 (*Gabrielson*). Gabrielson was an attorney who had represented a Long Beach resident intervening in a taxpayer lawsuit aiming to prohibit the city from using revenues from natural resources extraction in coastal tidelands for general municipal purposes. (*Id*. at p. 227.) The tidelands had been granted to the city in 1911 by the state in trust for purposes related to development of Long Beach Harbor, but once oil was discovered under the tidelands in 1937, there was a question as to how production revenues could be used. The Legislature in 1951 passed a statute allotting 50 percent of non-dry gas revenue for purposes outside the trust. (*Id*. at pp. 226-227.) This was the 1951 statute being attacked in the lawsuit. (*Id*. at p. 227.) Gabrielson's client contended the statute effectuated a partial revocation of the trust, and any released revenues should revert to the state. This contention was successful on appeal, and a few years later, the Legislature decided to settle the dispute by dividing the oil and gas revenue between the state and city and requiring the city's share to be used only for trust purposes. (*Ibid*.)

Gabrielson sought reimbursement for his fees, arguing a common fund entitlement – he had established the state's right to the released funds. The city and state both opposed the request. (*Gabrielson, supra,* 56 Cal.2d at p. 228.) The state said it had never consented to the action, and it was ultimately an action against both the city and the state, especially because both Gabrielson's and his client's "purpose in intervening was to defeat both the state's and city's interests by tying up the revenues in litigation until they could establish personal interests therein under federal mineral leasing applications."[23] (*Ibid*.) Under these circumstances, the California Supreme Court determined no fees

---

[23]   Gabrielson's client, Mrs. Alma Swart, had sought an oil and gas lease for some of the tidelands some years prior to the lawsuit, but due to a question as to federal or state ownership of the lands, the applications had not been granted. The trial court in the intervention lawsuit felt this demonstrated Mrs. Swart and Gabrielson's "real purpose" was to prevent any expenditure of revenues from the lands until the applications could be granted. (*Id*. at p. 231.)

could be awarded because "the attorney's and his client's ultimate objective [wa]s not to secure or preserve a common fund but to establish personal adverse interests therein." (*Id*. at p. 229.) The court went on to state: "Litigation so motivated calls for no added incentive in the form of fees from the common fund should the ultimate objective fail. Moreover, to allow them in such a case merely because the attorney's services have benefited the class to whom the fund belonged would place his interests in conflict with those of his client. An attorney retained to recover or protect a common fund so that it would be available when and if his client could establish an adverse right thereto might be induced to forsake his client's interest in the hope of securing more substantial fees from the common fund. Thus, if the evidence supports the trial court's finding that petitioner's and Mrs. Swart's purpose in intervening was to defeat both the state's and the city's interests, the judgment must be affirmed even though their ultimate objective was not achieved and petitioner's services were therefore of benefit to the state." (*Id*. at pp. 229-230.)

The doctrines and the exception were later applied to a closely held corporation in *Baker*. *Baker* involved a dispute between two shareholders who jointly owned two companies. The prevailing shareholder had sought involuntary dissolution of both companies. (*Baker*, *supra*, 176 Cal.App.3d at p. 376.) In such a context, the Second District Court of Appeal found there was no reason to apply either the common fund or substantial benefit doctrine: "The actions resulted in findings that appellant had misappropriated corporate funds and property, but this was to no one's detriment other than respondent's. Respondent and appellant were the only shareholders in each of the corporate entities." (*Id*. at pp. 378-379.) Thus, it could not "be claimed that there were parties other than respondent from whom fees could be sought and who were similarly situated with mutual interests in and mutual rights to proceed and recover the sums representing the fund." (*Id*. at p. 379.) As for substantial benefit, the court found "the rule can only be applied where a substantial benefit is extended to a clearly identifiable

26

class of persons." (*Id*. at p. 380.) Since no such class of persons existed in *Baker*, no fees were warranted under the doctrine. (*Ibid*.)

But it is *Cziraki* which is most on point. Thunder Cats, Inc. was a close corporation owned by Cziraki, Phillis and Van Den Berg. Phillis and Van Den Berg had applied for patents for certain designs and had promised to assign the interest in those patents to Thunder Cats so the designs could be manufactured by the company. Phillis and Van Den Berg then left and formed a separate company called Vanlar without Cziraki, giving Vanlar the benefit of the patents. They never assigned the patents to Thunder Cats and Cziraki was frozen out of their use and exploitation. (*Cziraki, supra,* 111 Cal.App.4th at p. 555.) Cziraki sued Thunder Cats, Phillis, and Van Den Berg for derivative and individual claims (which, we note, is what Leona did in this case). There were both direct and derivative claims against Phillis and Van Den Berg for breach of fiduciary duty, but Cziraki also sought a constructive trust as to the patents. (*Id*. at pp. 555-556.) He wanted Phillis and Van Den Berg to assign the patents to Thunder Cats. After prevailing at trial, Phillis and Van Den Berg were ordered to pay damages and also assign the patents to Thunder Cats as originally agreed. Cziraki sought attorney fees incurred on his derivative claim based on the common fund and substantial benefit doctrines. (*Id*. at p. 556.) The trial court denied the motion, but it appeared from the record that it did not believe either doctrine could be applied where all three shareholders in a close corporation had participated in the litigation. (*Id*. at pp. 556-557.)

The appellate court reversed. It determined Cziraki had created a common fund in the form of a monetary judgment, and also a substantial benefit from protecting the patent assignment, which was Thunder Cats' main asset. (*Cziraki, supra,* 111 Cal.App.4th at pp. 557-558.) The trial court had misconstrued the holding of *Baker* – it did not preclude application of the doctrines in the close corporation context. Instead, the doctrines did not apply in *Baker* because the prevailing shareholder would have been the only one to benefit; the lawsuit would result in the dissolution of the entities involved.

27

(*Id.* at p. 561.) In contrast, Thunder Cats would remain intact with its main asset preserved, and the award to it "would not be immediately passed on to individual shareholders through a dissolution proceeding." (*Ibid*.) The appellate court held the doctrines should apply "whenever (1) a shareholder derivative suit results in a substantial benefit to the corporation on whose behalf the plaintiff has brought suit, and (2) the judgment confers upon the plaintiff no individual benefit separate from that received by all of the shareholders." (*Id*. at p. 559.)

In 2008, an additional landmark emerged on the horizon. The Legislature passed the Uniform Limited Partnership Act of 2008 (ULPA)(Corp. Code, § 15900 et seq.), and through it Corporations Code section 15910.05. This provision clarified that, because "proceeds or other benefits of a derivative action . . . belong to the limited partnership," the court could award a plaintiff bringing a wholly or partially successful derivative claim her reasonable attorney fees from the limited partnership's recovery. (*Id*. at subds. (a)(1) and (b).) We agree with Leona that this statute appears to codify the common fund doctrine in the limited partnership context. But it does not take away the trial court's discretion. And we do not believe the trial court abused it in at least considering the adverse personal interest exception. After all, as stated elsewhere in ULPA, "[u]nless displaced by particular provisions of this chapter, the principles of law and equity supplement this chapter." (Corp. Code, § 15901.07, subd. (a).)

We do, however, think the trial court abused its discretion in its ultimate conclusion. It applied the adverse personal interest exception because it found Leona sought primarily to vindicate her individual rights, and her derivative claims were "secondary." Some of this language it derived from our ruling in *Avikian*, in which we upheld the denial of attorney fees to shareholders who were "seeking to advance their individual interests" through litigation. (*Avikian*, *supra*, 98 Cal.App.4th at p. 1118.)

While we appreciate the trial court's understandable desire to follow to the letter our language in *Avikian*, we feel its reliance on the case was misplaced. The

28

corporation involved in *Avikian*, WTC Financial Corp., was an insurance company in liquidation under the auspices of the Insurance Commissioner. The shareholders there had brought the action in violation of a restraining order vesting such claims in the Insurance Commissioner. (*Ibid.*) Thus they did not even have a right to pursue litigation in a derivative capacity. Moreover, they accomplished nothing through their lawsuit. The Insurance Commissioner reached his own settlement with the defendants on behalf of the company. (*Id.* at p. 1113.) Thus, in *Avikian*, it was crystal-clear that the plaintiffs were acting exclusively out of personal interest. Here, the situation is much different. Leona was entitled to pursue derivative litigation on Husite's behalf, and she was successful in obtaining a judgment for it.

Indeed, Leona's derivative claim aligns squarely with the raison d'etre of the common fund and substantial benefit doctrines. She unquestionably created a common fund which would not have existed without her prosecution of the claim. And her claim remitted to Husite the value of its asset, which would benefit the health of the entity and also "raise the standards of fiduciary relationships and of other economic behavior" necessary to maintain it in the future. (See *Fletcher*, *supra*, 266 Cal.App.2d at pp. 324-325.)

Husite believes the personal adverse interest exception ought to apply in large part because of Leona's pursuit of both direct and derivative claims against it. It claims this is unprecedented and untenable. But just like the entity defendant in *Denevi v. LGCC, LLC* (2004) 121 Cal.App.4th 1211, Husite has failed to cite any authority so stating. (*Id.* at p. 1223.) Moreover, Husite fails to appreciate two important considerations.

First, the breach for which Leona was seeking redress had two arguably separate components. The trial court found Brown II had harmed Husite by encumbering its main asset to the tune of $3.2 million. However, as we stated earlier, Leona was *also* suing Husite for the separate and independent act of making unequal distributions of the

29

loan proceeds – an act, potentially, of financial elder abuse. So, even though the same loan may have been at issue, there were two acts and two wrongs alleged with respect to it. Brown II committed the first act, and Husite itself committed the second.

Additionally, the trial court deferred ruling on the partnerships' motion to require Leona to elect between her direct and derivative causes of action until after the evidence was in.[24] This indicates *even the trial court* was having trouble discerning the nature of the injury and who may have been responsible. This situation was not present in *Cziraki*. There was no wrongful conduct alleged by Thunder Cats itself, and thus, no reason to name it as a direct defendant.

Having classified the claim as derivative and entered judgment creating a common fund, the trial court's denial of fees failed to do equity. Leona did not benefit from this judgment as it pertained to Husite. Yet she was left to bear the expense of prosecuting the claim. The doctrines exist to "prevent[] unjust enrichment" (See *Serrano v. Unruh* (1982) 32 Cal.3d 621, 627), "so that the active litigator who extends a benefit to a class of passive beneficiaries is not made to bear the cost of litigation on his or her own." (*Baker*, *supra*, 176 Cal.App.3d at p. 380.) Our Supreme Court outlined factors in *Stauffer* which guide application of the doctrines, and those factors militate in Leona's favor. (*Stauffer*, *supra*, 53 Cal.2d at p. 132.) It would be unfair for Leona's share of the Husite recovery to be almost completely consumed by the expense of bringing the claim. There are other Husite shareholders besides Brown II and the Brown children who will be "entitled to share in the fund."[25] (*Stauffer*, *supra*, 53 Cal.2d at p. 132.) These shareholders are precisely the type of passive beneficiaries who would be unfairly advantaged if Leona were made to bear the expense on her own. And while Leona's

---

[24]     Husite concedes this ruling is not being challenged on appeal.

[25]     Brown II is Husite's general partner, but in addition to persons and entities already party to this litigation, its limited partnership includes five other persons or entities who have *not* been involved in the litigation.

attorneys have already obtained sizeable fee awards against other defendants, they have recovered nothing from Husite and neither has she.

Indeed, the trial court seems to have taken the personal adverse interest exception further than the relevant cases have. In *Fox,* our high court noted the plaintiff therein had not pursued the litigation for his "exclusive benefit" or in his own right. (*Fox*, *supra*, 108 Cal. at p. 477.) But this is a far cry from saying a shareholder may not pursue his or her own interest simultaneously with the company's interest *at all*. *Baker* applied the exception not so much because the shareholder therein *primarily* sought to benefit himself, but because there was *literally* no one else who could benefit besides himself. (*Baker*, *supra*, 176 Cal.App.3d at p. 379.) *Cziraki* court noted the plaintiff had not derived an individual benefit from the litigation and no "adverse personal interest" was served. (*Cziraki*, *supra*, 111 Cal.App.4th at pp. 560-561.) But, again, this is not the same as saying *Cziraki* did not stand to gain himself from the litigation.

In fact, it can fairly be said that most, if not all, shareholders primarily hope to vindicate a personal right somewhere along the line. They are invested in the entity, after all, and any injury to the entity impacts their interest. The personal stake is what gives a shareholder standing to bring a claim in a derivative capacity in the first place. "Because a derivative claim does not belong to the stockholder asserting it, standing to maintain such a claim is justified only by the stockholder relationship and the indirect benefits made possible thereby, which furnish the stockholder with an interest and incentive to seek redress for injury to the corporation." (*Grosset v. Wenaas* (2008) 42 Cal.4th 1100, 1114.) If such a personal stake itself precludes reimbursement of fees, the common fund or substantial benefit doctrines could never be applied to a limited partnership. As Leona persuasively argues, this would directly contravene Corporations Code section 15910.05.

This is why the shareholder's interest must be *adverse* to the partnership. Husite argues this case is more similar to *Gabrielson*, because Leona has consistently

31

sought remedies that would benefit her individually and that might dissipate its assets. It points to the trial court's minute order outlining several places in the record where Leona sought her share of damages due the corporate entities. But this evidence does not prove the point Husite wishes to make. True, Leona consistently framed her claim against Husite as direct because she viewed it as a claim for disguised dividends, and she asserted the derivative claim in the alternative *in case* the trial court concluded the claim was Husite's instead. But we see nothing problematic in this. As we've intimated, Leona can be forgiven somewhat for pleading the claim as both a direct and derivative claim given the complexity of the facts. Moreover, unlike the intervenors in *Gabrielson*, she did not pursue a personal interest *adverse* to the common fund by seeking her share of Husite's recovery. Instead, she was seeking the amount which would have been owed to her had she brought the action solely in a derivative capacity. And even if Leona's interest was to recover amounts due to her personally, the fact remains that she recovered nothing vis-à-vis the Husite loan. As *Gabrielson* counsels, it is acceptable for litigation expenses to go unreimbursed when intervention litigation was prosecuted for the purpose of establishing an adverse interest in the common fund. (*Gabrielson*, *supra*, 56 Cal.2d at pp. 229-230.) But from our reading of *Gabrielson*, it would not be acceptable to leave a shareholder holding the bag for creating a common fund from which *all* shareholders, and not just herself, could equally benefit.

Finally, we must remind ourselves that the case overall sounds in financial elder abuse. If anything, the adverse personal interest at stake here was Leona's statutory right as an elder to seek redress for the taking or appropriation of property rightfully belonging to her. There can be no doubt the Legislature deems this a particularly important one.

Accordingly, we reverse the trial court's denial of Motion 2 against Husite and find she was entitled to reimbursement under the common fund or substantial benefit doctrine.

32

**B.        Calculation of Fee Award (Motions 1 and 2)**

We thus conclude the only party in this appeal entitled to attorney fee awards is Leona – one award from the Brown children (which the trial court granted) and one from Husite (which the trial court did not). We remand the calculation of the latter award. As to the Brown children, in its ruling on Motion 1, the trial court ordered them to pay a total of $411,955.07 in attorney fees to Leona after she requested $462,396.77. They claim this amount is excessive because Leona was only successful on one of her allegations of financial elder abuse against them. They believe the amount should be apportioned so they pay only for those fees incurred on the Bumblebee property issue up to August 2014, when the stipulated payment was made.[26]

In making an award of attorney fees in an elder abuse case, the trial court should look to the factors in section 15657.1: those "set forth in Rule 4-200 of the Rules of Professional Conduct of the State Bar of California, and all of the following: [¶] (a) The value of the abuse-related litigation in terms of the quality of life of the elder or dependent adult, and the results obtained. [¶] (b) Whether the defendant took reasonable and timely steps to determine the likelihood and extent of liability. [¶] (c) The reasonableness and timeliness of any written offer in compromise made by a party to the action[.]" The Brown children claim it would be counterproductive under this statute to award Leona her full fees for the Bumblebee property issue when she received their stipulated payment very early on in the action. They also argue it was inherently unreasonable for Leona to continue to litigate the Bumblebee property claim after receiving the stipulated payment.

We do not consider the stipulated payment an offer in compromise. The Brown children did not offer to settle the entire litigation against them in exchange for $376,000. They stipulated to pay Leona $376,000 to keep her from continuing to

---

26        Mr. Gold admitted Leona had only incurred $50,751.62 in fees on the Bumblebee claim by then.

33

successfully attach their properties. Had they desired to settle the action in full, there were avenues available to them for doing so. We find it instructive that they never used them.

Even though Leona ultimately was awarded less than the amount of the stipulated payment, it was not unreasonable for her to have litigated the claim to judgment. In order to recover her attorney fees under section 15657.5, there had to be a finding of liability on the Brown children's part. This could only happen through a trial. We do not believe the trial court abused its discretion in awarding Leona the full amount of attorney fees incurred on the Bumblebee property claim, and we affirm its award against the Brown children on Motion 1.

**III.          The Trial Court's Rulings on Costs (Motions 3, 8 and 11)**

There are two overarching issues raised with respect to costs: the prevailing party determinations and apportionment of costs as between prevailing and non-prevailing defendants who were jointly represented. We take each issue up separately.

**A.          Prevailing Party Determinations**

Leona contends the trial court erroneously declared Husite, Sure Save, PSC, PSC Holdings, and the Brown children prevailing parties. Having obtained a significant derivative recovery for Husite, she argues, it is unfair to find it and Sure Save prevailed against her on her direct claim, which was posited on the same facts. Because she obtained a similar derivative recovery for PMP against the PSC entities, she also thinks it was error for the trial court to find they prevailed against her on her direct claims. Finally, she says the trial court was inconsistent in ruling the Brown children were prevailing parties while also awarding her costs against them on her elder abuse claim.

We start with the final argument because it is the most swiftly resolved. As we have already said, the Brown children were held liable for financial elder abuse, and under section 15657.5, Leona was entitled to both attorney fees and costs. In its ruling on

34

Motion 11, the trial court erred in declaring the Brown children prevailing parties for purposes of costs, because, pursuant to our discussion above, section 15657.5 carves out a statutory scheme separate from Code of Civil Procedure section 1032. Under section 15657.5, Leona was entitled to recover her costs from the Brown children, not the other way around. And as we previously stated, we do not believe the Brown children were prevailing parties under Code of Civil Procedure section 1032, subdivision (a)(4) anyway. Leona most certainly did have a net monetary recovery against them; it was just paid to her earlier in the litigation. As such, her motion should have been granted as to any costs incurred by the Brown children, and we reverse and remand the ruling on that basis.

Leona was ultimately unsuccessful in holding Husite, Sure Save, PSC or PSC Holdings liable for financial elder abuse. As a result, section 15657.5 does not govern the analysis for these defendants and we revert to Code of Civil Procedure section 1032. In this conclusion, we are guided by *Murrillo v. Fleetwood Enterprises, Inc.* (1998) 17 Cal.4th 985 (*Murrillo*), in which our high court found the unilateral fee-shifting provision in the Song-Beverly Consumer Warranty Act did not operate to preclude a prevailing defendant from obtaining an award of costs under Code of Civil Procedure section 1032. This statute applies as a matter of course unless "expressly provided" by another statute, and the Song-Beverly fee provision did not expressly preclude prevailing defendants from costs. (*Id.* at pp. 990-991.) The *Bates* court later relied on *Murrillo* in extending this analysis to section 15657.5.[27] (*Bates*, *supra*, 204 Cal.App.4th at pp. 218-219.)

---

[27] We note the analysis is different for costs as opposed to attorney fees, because costs are a statutory right for a litigant who meets the definition of a prevailing party under Code of Civil Procedure section 1032, subdivision (a)(4). (See *id*. at subd. (b).) In contrast, attorney fees are not available to a prevailing party by default. They are left to the parties' agreement unless expressly provided otherwise by statute. (See *Murrillo*, *supra*, 17 Cal.4th at p. 999; see also Code Civ. Proc., §§ 1021, 1033.5, subd. (a)(10).)

Leona forcefully argues her success on the derivative claims should have colored the trial court's prevailing party determination under Code of Civil Procedure section 1032 with respect to Husite and the PSC entities. But, as our Supreme Court has stated, we have no power to "ignore the actual words of the statute in an attempt to vindicate our perception of the Legislature's purpose in enacting the law." (*Murrillo, supra*, 17 Cal.4th at p. 993.) Leona "[did] not recover any relief against" Husite, Sure Save, PSC, or PSC Holdings. (See Code Civ. Proc., § 1032, subd. (a)(4).) She only recovered money in a derivative capacity *for* Husite. She recovered nothing personally *against* Sure Save and nothing in a derivative capacity *for* Sure Save. And with respect to PSC and PSC Holdings, the recovery goes to PMP.[28] Leona was only bringing the claims in PMP's stead, and the claim has always belonged to it.

But there is another basis for costs against Husite over and above Code of Civil Procedure section 1032. By way of Motion 2, Leona also sought her costs from Husite pursuant to Corporations Code section 15910.05 and the common fund and substantial benefit doctrines. In Motion 8, Leona reminded the trial court of this. But the trial court did not address this issue in denying Motion 8. Because Corporations Code section 15910.05 allows a successful derivative plaintiff to recover "reasonable expenses" from a limited partnership, and because we reverse and remand the trial court's ruling on Motion 2, we also remand Motion 8 for further proceedings.

B.        Apportionment of Costs

Finally, Leona and Jill take issue with the trial court's ruling on Motion 11 as it pertained to New Brown and Foothill. They argued these defendants incurred no costs other than their first appearance fees, with the other costs in the memorandum being

---

[28]        We deny Leona's and Husite's requests for judicial notice of documents pertaining to a postjudgment arbitration occurring between the parties. Leona claims the documents clarify the withdrawal of her appeal as to PMP, and Husite contends the documents show Leona's inconsistency with respect to enforcing or interpreting the Husite partnership agreement. Ultimately, these documents are not germane to our resolution of the appeals.

36

incurred by other Brown-related defendants. They also claimed only Jill should be responsible for Foothill's first appearance fee, and only Leona should be responsible for New Brown's first appearance fee. The trial court did not address this argument in its final ruling on the motion. However, during the hearing, the trial court expressed its reluctance to conduct such an apportionment because all defendants "had to be [t]here" during the trial.

As we have already stated, the ruling on Motion 11 must be reversed and remanded because it erroneously concludes the Brown children are prevailing parties, which they are not. But remand is also required for a proper apportioning of costs.

"All costs awarded to a prevailing party must be (1) incurred by that party, whether or not paid; (2) 'reasonably necessary to the conduct of the litigation rather than merely convenient or beneficial to its preparation'; and (3) reasonable in amount. (§ 1033.5, subd. (c)(1)-(3); see *El Dorado Meat Co. v. Yosemite Meat & Locker Service, Inc.* (2007) 150 Cal.App.4th 612, 616.)" (*Charton*, *supra*, 247 Cal.App.4th at p. 739.) Therefore, "'"[w]hen a prevailing party has incurred costs jointly with one or more other parties who are not prevailing parties for purposes of an award of costs, the judge must apportion the costs between the parties' [based on the reason the costs were incurred and whether they were reasonably necessary to the conduct of the litigation by the jointly represented party who prevailed].'" (*Wakefield* [*v. Bohlin* (2006)] 145 Cal.App.4th [963,] 986; see *Ducoing Management, Inc. v. Superior Court* (2015) 234 Cal.App.4th 306, 315 []; *Fennessy v. Deleuw–Cather Corp.* (1990) 218 Cal.App.3d 1192, 1196–1197 [].) (*Charton*, *supra*, 247 Cal.App.4th at pp. 743-744.)

Here, it appears the trial court refused to apportion simply because all defendants were party to the litigation to the very end of trial. This was improper; it had to conduct an apportionment analysis to the extent of any jointly incurred costs. ". . . [W]hen allocating costs between jointly represented parties, the court must examine the reason each cost was incurred, whether the cost was reasonably necessary to the conduct

37

of the litigation *on behalf of the prevailing party*, and the reasonableness of the cost." (*Charton, supra,* 247 Cal.App.4th at p. 745, italics added.) Because Joe, Brown II, New Brown, Foothill, PSC, PSC Holdings, and the Brown children were jointly represented and filed a joint memorandum of costs, the court had to undertake the following analysis: (1) ascertain the costs incurred by just the prevailing parties, and deduct any amounts incurred by the non-prevailing parties, (2) determine which of the costs incurred by just the prevailing party were necessary and reasonable, and (3) ascertain which of the jointly incurred costs was necessary and reasonable *for the prevailing defendants*. On remand, this process could be rendered easier by taking additional briefing or submissions to arrive at the correct amount.

As to who is liable for costs as between Jill and plaintiff, the court's ruling on Motion 11 indicates it did not apprehend or resolve the issue. In fact, its ruling suggests it thought the motion was brought only by Leona. In any event, the record does not contain the amended judgment, which would contain the final cost awards entered upon resolution of the motions to strike or tax costs. (See Code Civ. Proc., § 685.090, subd. (a).) Thus, it is not clear the issue is ripe for our review. It can and should be dealt with on remand.

## DISPOSITION

The rulings denying contractual attorney fees to the Brown children, Husite, and Sure Save (Motions 7 and 10) and awarding Leona attorney fees against the Brown children (Motion 1) are affirmed. The rulings denying Leona attorney fees and costs as to her derivative claim on behalf of Husite (Motion 2) and declaring Husite the prevailing party for purposes of costs (Motions 3 and 8) are reversed and remanded to the trial court for further proceedings to (1) calculate an appropriate award of attorney fees payable by Husite under the common fund or substantial benefit doctrines and (2) resolve the related costs issue. The ruling on Leona and Jill's motion to strike or tax the Brown defendants' memorandum of costs (Motion 11) is also reversed and remanded for further

38

proceedings consistent with this opinion.  The rulings are affirmed in all other respects. Leona is to recover her costs on appeal.


                                        BEDSWORTH, ACTING P. J.

WE CONCUR:


FYBEL, J.


GOETHALS, J.